[Civ. No. 27234. Second Dist., Div. Four. Dec. 4, 1963.]

FLORENCE MACKOFF, Plaintiff and Respondent, v. BILTMORE GARAGES, INC., Defendant and Appellant.

Joseph W. Jarrett, Henry F. Walker and Abe Mutchnik for Defendant and Appellant.

Irving H. Green and Hillel Chodos for Plaintiff and Respondent.

KINGSLEY, J.—This is an appeal by Biltmore Garages, Inc. (hereinafter referred to as defendant) from an adverse judgment, wherein Florence Mackoff (hereinafter referred to as plaintiff) was awarded the sum of $50,000 and costs for alleged personal injuries suffered by her as a result of a "slip and fall" on defendant's public parking garage premises.

A synopsis of the material facts, stated in the light most favorable to plaintiff, pertaining to the issue of defendant's liability, is as follows: Defendant operates a public garage for the parking and receiving of automobiles owned by its patrons. On the afternoon of Saturday, September 5, 1959, plaintiff drove her automobile into the Grand Avenue entrance to the third floor of the garage for the purpose of parking it there. She had as passengers two lady friends and the three were on the way to attend a matinee at the nearby Biltmore Theatre. Near the garage entrance plaintiff left the vehicle with an attendant who gave her a claim check, indicating that the car was parked at 1:58 p.m.

Thereafter, the three ladies attended the matinee and, at its conclusion at approximately 4:45 p.m., plaintiff, accompanied by her two friends, proceeded to walk to the garage, entering the garage via the Grand Avenue entrance. Upon arrival plaintiff handed an attendant her claim check. The claim check was stamped with the time 5:07 p.m.

On Saturday afternoons the garage operates what it calls a "semi-valet service." Under this arrangement, employees of defendant park the cars when they come in, but the patrons,

when they return for their automobiles, are required to walk into the garage to the stalls where the cars are parked and drive the cars out of the stalls themselves. The reason for this arrangement is that ordinarily some 75 or more patrons of the third floor alone attend the matinee and all return to the garage for their automobiles at about the same time. In order to avoid the long wait which would result if the garage attendants drove all the cars from the stalls where they were parked to one spot where the patrons were congregated, the patrons are asked to drive their own cars out of the stalls.

Plaintiff was similarly told by an attendant to pick up her own auto but was not told where it was parked on the floor. Plaintiff, followed by her two friends, walked into the depth of the garage for her automobile. Plaintiff proceeded in an easterly direction down an aisle[1] toward the back wall and thereafter saw her car parked in a stall. As plaintiff drew near her auto, her foot went out from under her because of an accumulation of oil in the aisle near the place where her car had been parked by the garage attendant. The oil slick or smear was of light color, and was about 18 inches by 10 inches in size. The oil slick had some abrasive accumulations of dust or dirt, and had been in place long enough to spread. Plaintiff claims that this fall was the direct and proximate cause of her injuries.

Appellant points to the fact that the evidence is undisputed that the oily spot on which plaintiff allegedly slipped and fell was not deposited on defendant's floor by any of defendant's employees, but resulted by leakage from some unknown patron's automobile. On this basis, argues defendant, it is settled law that defendant, as the operator of a business enterprise, is not liable for injuries caused to a business invitee, without substantial proof that the defective condition which is alleged to have caused such injuries had existed for a sufficient length of time to have enabled defendant, as a reasonable garage proprietor under the circumstances, to have discovered and remedied the condition prior to plaintiff's fall. (*Oldenburg* v. *Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733 [314 P.2d 33].) And, in light of the whole record, it argues there is no substantial evidence indicating that the defective condition existed for such a

---

[1]Appellant contends that the oil was between plaintiff's car and the place where a second car either was or could have been parked. However, witness Bunker testified that the oil spot was in the aisle, which he had just defined as "the pathway where people walked to get their car."

length of time that defendant had reasonable opportunity to discover and remedy the defect. With this contention we cannot agree.

Mr. Snyder, the operating manager of defendant's garage, being examined under Code of Civil Procedure, section 2055, testified that most of the Saturday parking was theatre parking and was done between 1:30 and 2:30 in the afternoon; that the parking attendants did not go down the aisles unless they had a car to park or one to pull, and that between 2:30 and 5 there wasn't much to do; that there was no system of periodic inspection set up for touring the floors to find oil spots; that he was aware of the high degree of probability that, with 40 cars parked in an area for a period of three hours, one of them would leak oil or grease on the floor; and that no inspection would be made by the attendants for oil spots unless they had occasion to go down the aisles to park a car or pull one out.

Mr. Strickland, one of the defendant's parking attendants on duty at the time of the accident, testified that he knew 80 to 90 people would be coming in at 5 o'clock to pick up their cars, and that, under the semi-valet parking system, the patrons would be required to walk along the aisles of the garage in order to find and pick up the cars.

William Ballard, a witness for defendant, testified that he came on duty at 4 o'clock on the day in question, and that it was his habit when he came on duty at 4 o'clock to check the aisles but he had no independent recollection of checking the aisles on the day in question.

Woodruff Bunker, a witness for plaintiff, testified that there was dirt or dust in the oil smear. Furthermore, defendant introduced no evidence that any cars were parked or pulled between the hours of 2:30 and 4:45, which may have tended to show that the parking attendant may have made an inspection of the aisles during this interval.

From this evidence defendant was fully aware of the danger of oil leaking onto the floor, and knew that a crowd of people would be coming in at 5 and would be required to go back into the garage to find their cars.　While there is no direct evidence in the record to establish the time when the oil on which plaintiff slipped was first deposited on the floor of the garage, "... [d]irect evidence is not essential to the proof that a dangerous condition existed so long as by the exercise of reasonable care it should have been discovered and remedied. Such facts, like other facts, may be proved by cir-

cumstantial evidence." (*Lehman* v. *Richfield Oil Corp.* (1953) 121 Cal.App.2d 261 [263 P.2d 13].) In *Bridgman* v *Safeway Stores, Inc.* (1960) 53 Cal.2d 443, the court stated at page 447 [2 Cal.Rptr. 146, 348 P.2d 696]: "... evidence that an inspection had not been made within a particular period of time prior to an accident may warrant an inference that the defective condition existed long enough so that a person exercising reasonable care would have discovered it."

Considering all of the foregoing facts and testimony,[2] together with the inferences that may logically be drawn therefrom, the jury may quite properly have inferred that the oil slick was there a considerable length of time, no inspection had been made during this time, and defendant had ample opportunity to discover and remedy the defect.

Defendant contends also that the trial court committed prejudicial error in denying defendant his right to cross-examine one of plaintiff's witnesses in order to show that witness' bias.

The facts surrounding this alleged assignment of prejudicial error are as follows: Trial of the action commenced on June 4, 1962. Before the *voir dire* examination of the jury panel, the trial judge called counsel into chambers and informed them that he was requiring them, prior to the presentation of any testimony, to produce all documents which were to be used in the trial for inspection by opposing counsel and to be marked for identification, except for documents which could later be used for "surprise." The judge did not explain what he meant by "surprise."

Some days after trial had commenced, counsel for defendant, during the cross-examination of one of the medical witnesses for plaintiff, sought to interrogate the witness about an article which he had authored, entitled "When a Doctor Goes to Court," which was a publication of an address read by the doctor at the Eleventh Biennial International Congress of Surgeons, held in Los Angeles in March, 1958. The witness in question was the surgeon who had advised, and conducted, a major operation on plaintiff. Although his medical testimony was supported to some extent by that of two other doctors who had examined and treated plaintiff, one of whom had referred her to the witness, it is on the medical

---

[2]Much space is devoted in the briefs pertaining to the admissibility of alleged statements made by one of defendant's employees. However, there is sufficient evidence, without these statements, to impose liability on defendant.

diagnosis of this witness that much of plaintiff's claim for damages rests.

The main purport of the article in question is to deplore the filing of malpractice suits against doctors. It complains of the treatment of doctor witnesses in courts, asserting: the doctor becomes a prisoner in the dock and everything is done to implant in the jury's mind a doubt as to the doctor's integrity; he is badgered, bullied, harassed, accused of bearing false witness, of lacking medical knowledge and of harboring prejudice in favor of the claimant or of the fellow physician whom he came to assist; all of this occurs because a small group of members of the legal profession have found that suing the doctor has brought them fabulous financial success; that a trial is a "game" which "no one is playing for keeps"; and that a doctor should learn "to fence in court, with tongue sharper than foils."

While it is true that excerpted portions of the article, considered alone and out of context, as well as the general tenor of the article, display an attitude of the author toward judicial proceedings which is neither commendable nor flattering to courts or lawyers, still, when the article is read in its entirety, it cannot be said that it serves to destroy or impair the credibility of the author as an expert medical witness. On the crucial point of honesty in testimony to be given by a medical witness, the doctor advocated in the article: "Don't bear false witness. ... Don't permit a fallacious or greedy patient to induce you to make any statement that is not entirely true. (Sufficient unto the day be the evil thereof when we must go to court to protect one another.) A feeling of justice will enable you more easily to outface the cheeky attorney."

It is true, as defendant argues, that a witness may be required to answer any question which tends to test his credibility and that, as to such matters, liberal cross-examination is the rule. (*Newman* v. *Los Angeles Transit Lines* (1953) 120 Cal.App.2d 685, 691 [262 P.2d 95]; *Kelley* v. *Bailey* (1961) 189 Cal.App.2d 728, 736 [11 Cal.Rptr. 448].) But a trial court also has a wide discretion to keep the trial from disintegrating into a series of explorations of relatively collateral matters. As we have pointed out, the trial judge's conclusion that the article had little, if any, bearing on the doctor's credibility was well founded. The article is inflammatory in nature, lengthy, and basically completely foreign to the issues of the instant case. It was within the

sound discretion of the trial court to weigh its possible effects upon the litigants, the jury and the cause on trial and to decide whether or not to permit cross-examination concerning it. We conclude that the ruling complained of did not constitute an abuse of discretion, nor did the court improperly invade the province of the jury in determining the credibility of a witness.

Since the ruling is supported by these considerations, we need not consider whether the preliminary order for production of documents was proper, nor whether the trial court properly applied that order to the article in question.

The judgment is affirmed.

Burke, P. J., and Jefferson, J., concurred.

Appellant's petition for a rehearing was denied December 23, 1963, and its petition for a hearing by the Supreme Court was denied January 29, 1964.